UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

PAUL E. SMITH, JR.,

                    Petitioner,                  Case No. 1:05-cv-494

v.                                            Honorable Paul L. Maloney

KELLEAH KONTEH,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner challenges his jury trial convictions for two counts of first-degree criminal sexual conduct (CSC I) against a person under thirteen years of age, MICH. COMP. LAWS § 750.520b(1)(a). On June 28, 2002, the Grand Traverse County Circuit Court sentenced Petitioner to concurrent prison terms of two hundred and eighty-five months to sixty years and thirty to sixty years as a third habitual offender, MICH. COMP. LAWS § 769.11.[1] (First Am. Pet. at 1, docket #5.)  In his first amended habeas corpus petition (docket #5), Petitioner raises the following three grounds for habeas corpus relief (verbatim):

      I.      PETITIONER'S WAIVER OF HIS RIGHT TO COUNSEL ON SECOND DAY OF TRIAL WAS NOT MADE KNOWINGLY INTELLIGENTLY VOLUNTARILY.  THUS VIOLATING PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHT TO COUNSEL.  U.S.C.A. 6, 14.

---

[1]Petitioner is currently incarcerated in the Ohio Department of Rehabilitation and Correction for felonious assault and abduction. Those sentences, which are not subject to challenge in the present case, expire on March 30, 2009. *See* Ohio Dep't of Rehab. & Corr. website at http://www.drc.ohio.gov/OffenderSearch/Details.aspx?id=A414888.

II.   FAILURE OF PROSECUTOR TO DISCLOSE HIS INTENT TO OFFER "OTHER ACTS" EVIDENCE.  THUS, VIOLATING PETITIONER'S SIXTH AMENDMENT RIGHT TO CALL WITNESSES IN HIS FAVOR TO REBUT THE PROSECUTION CASE IN CHIEF AS WELL AS VIOLATED THE PETITIONER'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS, EQUAL PROTECTION OF THE LAW AND THE RIGHT TO A FAIR TRIAL AND AN IMPARTIAL JURY AS WELL AS A BRADY VIOLATION.

III.   INSUFFICIENT EVIDENCE.

(First Am. Pet. at 6-7, 9, docket #5.)  Respondent has filed an answer to the first amended petition (docket #19) along with the state-court record.  Petitioner filed a reply (docket #44) on July 13, 2006.  On November 30, 2006, Petitioner moved to amend his first amended petition (docket #48).  By memorandum opinion and order (docket ##49-50), this Court granted Petitioner's motion, in part, allowing him to supplement his first ground for habeas corpus relief with a claim for ineffective assistance of counsel as it relates to the "voluntary" waiver of his right to counsel but denied Petitioner's motion to add unexhausted constitutional claims.  (Order, docket #50.)  On September 20, 2007, Petitioner filed a motion to expand the record (docket #63) to include Jessica Gaines' December 20, 2000 interview transcript in support of his first ground for habeas corpus relief.  This Court granted Petitioner's motion to expand the record on May 22, 2008 (docket #67).

## Procedural History

### A.   Trial Court Proceedings

The state prosecution arose from Petitioner's sexual abuse of his step-daughter, Jessica Nicole Gaines, from January 1996 to February 2000, when she was between the ages of nine and twelve years old.  Petitioner was charged with two counts of first-degree criminal sexual conduct (CSC I) with a person under thirteen years old, MICH. COMP. LAWS § 750.520b(1)(a), as a third

habitual offender, MICH. COMP. LAWS § 769.11.  Following a preliminary examination on April 1,

2002, Petitioner was bound over on the two CSC I charges.  The first count was for sexual

penetration (penetration of the penis in the victim's mouth), which allegedly occurred at the Betsie

River Road address and the second count was for sexual penetration (vaginal penetration), which

allegedly occurred at the Peninsula Road address.  (Apr. 1, 2002 Prelim. Examination Hrg. at 49-50,

docket #27.)  Petitioner was tried before a jury beginning June 4, 2002, and concluding on June 11,

2002.[2]

 The prosecution called the victim, Jessica Gaines, as its first witness.  Jessica testified

that she was fifteen years old at the time of the trial.  (Tr. I, 127.)  Jessica was born on December 28,

1986.  (Tr. I, 127.)  Jessica's family includes her mother, Gina Smith; younger brother, Tony; and

two younger sisters, Brittany and Manda.  (Tr. I, 127-28.)  Petitioner is Jessica and Tony's step-

father.  (Tr. I, 128; Tr. II, 359.)  Brittany and Manda are Petitioner's biological children.  (Tr. II,

359.)  Petitioner lived with Jessica for eleven years, beginning when she was two years old and until

she was thirteen years old.  (Tr. I, 128.)  The sexual abuse occurred in the following two locations

in Grand Traverse County:  at the Betsie River Road house and the Peninsula Road house**.**  (Tr. II,

504-05.)

 In 1996, Petitioner started to touch Jessica at their house on Betsie River Road.  (Tr.

I, 133-34, 226.)  Jessica was nine years old and in the third grade at that time.  (Tr. I, 134.)  On a

spring night, Jessica, who shared a bed with her sister Brittany, could not sleep.  (Tr. I, 135.)  Jessica

---

[2] Transcripts from the trial will be numbered I through IV as follows:
Transcript of June 4, 2002, vol. I, docket #31 (Tr. I);
Transcript of June 5, 2002, vol. II, docket #32 (Tr. II);
Transcript of June 6, 2002, vol. III, docket #33 (Tr. III); and
Transcript of June 11, 2002, vol. IV, docket #34 (Tr. IV).

asked her mother if she could sleep somewhere else.  (Tr. I, 135.)  Jessica's mother told her to sleep

in their bed until Petitioner came home.  (Tr. I, 135.)

      That night,  Jessica awoke when Petitioner picked her up and moved her closer to him

on the bed. (Tr. I, 136.)  Jessica noticed that Petitioner had been drinking. (Tr. I, 145-46.)  Petitioner

was wearing a shirt and boxers.  (Tr. I, 136.)  Jessica was sleeping in a long T-shirt and underwear.

 (Tr. I, 137.)  She also had her stuffed bunny with her.  (Tr. I, 137.)  Petitioner held Jessica for awhile

on the bed.  (Tr. I, 137, 230.)  Eventually, Petitioner asked Jessica if she wanted to know where he

was "really ticklish."  (Tr. I, 138.)  After replying yes, Petitioner took Jessica's hand and put it over

his penis.  (Tr. I, 138-39.)  Jessica pulled her hand away.  (Tr. I, 139.)  Petitioner placed Jessica's

hand on his penis again and moved it in a rubbing motion.  (Tr. I, 139.)  Jessica testified that

Petitioner's penis was hard.  (Tr. I, 139.)  Petitioner then pushed Jessica's head onto his penis and

told her act like it was a sucker.  (Tr. I, 140.)  It choked Jessica.  (Tr. I, 140.)  After a couple of

seconds, Jessica managed to pull away.  (Tr. I, 140.)  Petitioner then told Jessica to give him a kiss.

(Tr. I, 141.)  After kissing Petitioner, he said "I'll show you how big girls kiss."  (Tr. I, 141.)

Petitioner told Jessica to open her mouth.  (Tr. I, 141.)  Petitioner then grabbed Jessica's face,

squeezed her jaw and stuck his tongue in her mouth.  (Tr. I, 141.)  Again, Jessica pulled away.  (Tr.

I, 141.)

      Jessica testified that Petitioner ejaculated while he was holding her hand over his

penis.  (Tr. I, 142.)  Jessica pulled her hand away.  (Tr. I, 142.)  Petitioner then cleaned himself off

with his shirt.  (Tr. I, 142.)

      After Petitioner had Jessica touch him, he said it was his turn.  (Tr. I, 141.)  Petitioner

pulled Jessica's underwear down.  (Tr. I, 141.)  Petitioner then placed his finger in Jessica's vagina

and made a rubbing motion with his finger.  (Tr. I, 147.)  Petitioner also went under the covers and licked Jessica's vagina.  (Tr. I, 141-42, 147.)  Jessica was scared and focused on her stuffed bunny.  (Tr. I, 142.)

When it ended, Jessica said she had to go to the bathroom.  (Tr. I, 142-43.)  Jessica sat down for a minute in the bathroom.  (Tr. I, 143.)  She felt sick to her stomach.  (Tr. I, 143.)  After returning to the bedroom, Petitioner told her that she could go to bed.  (Tr. I, 143.)  Jessica walked into the living room, told her mom that she felt sick to her stomach, and then climbed back into the bed she shared with Brittany.  (Tr. I, 143-44.)  Her mother was sleeping in a chair in the living room.  (Tr. I, 143.)  Her mother, half-awake, replied that they will see how Jessica was feeling in the morning.  (Tr. I, 232.)

The next morning, Jessica overheard Petitioner tell her mother not to send the kids to school.  (Tr. I, 235.)  Petitioner then came into Jessica's bedroom, apologized and asked Jessica if she was okay.  (Tr. I, 238.)  Jessica nodded yes.  (Tr. I, 238.)  Petitioner apologized to Jessica in front of her sisters in her bedroom.  (Tr. I, 148.)  Petitioner said "[w]e don't have to tell anybody, okay?  I'm sorry and it will never happen again."  (Tr. I, 148.)  Jessica agreed and Petitioner left the room.  (Tr. I, 148.)

Later in the morning, Jessica's mother called her into the living room.  (Tr. I, 148-49, 239.)  Petitioner was crying and shaking.  (Tr. I, 239, 241.)  He said "[t]ell her, Jess."  (Tr. I, 239.)  When her mother inquired, Jessica pointed towards Petitioner's private areas and said "[h]e put my hand there."  (Tr. I, 240.)  Jessica's mother started to cry and yell at Petitioner so Jessica ran into her bedroom.  (Tr. I, 150, 240-41.)  Petitioner just kept on saying that he was sorry.  (Tr. I, 241.)  All of the children stayed home from school that day with Petitioner and their mother.  (Tr. I, 152, 242-43.)

For lunch, Petitioner drove Jessica to McDonald's and apologized again.  (Tr. I, 153, 244.)  Petitioner asked Jessica if everything was alright on the drive.  (Tr. I, 153, 245.)  Jessica replied yes.  (Tr. I, 153, 245.) Jessica also spoke to her mother about the incident when the two of them drove to the store that day.  (Tr. I, 154-55, 247-48.)  Jessica's mother asked her if she was okay and whether Petitioner touched her.  (Tr. I, 248.)  Jessica, however, refused to talk about it.  (Tr. I, 155.)  She did not tell her mother that she performed oral sex on Petitioner, that Petitioner put his finger inside of her or that he performed oral sex on her.  (Tr. I, 155.)  Instead, Jessica reassured her mother that she was fine and nothing else happened.  (Tr. I, 155.)  Jessica testified that she did not tell her mother for fear of breaking up the family.  (Tr. I, 158.)

After that incident, Jessica stated that Petitioner was really quiet and did not want to be around her.  (Tr. I, 156-57.)  Nevertheless, Jessica went on as if nothing happened so their relationship would be the same.  (Tr. I, 157.)  She was fearful of Petitioner.  (Tr. I, 157.)

After a few weeks, Jessica, her mother and Petitioner discussed the incident again because Jessica's mother noticed that Petitioner was treating Jessica differently than the other children.  (Tr. I, 159, 255.)  Petitioner would not talk to Jessica or look at her.  (Tr. I, 159.)  Jessica asked Petitioner why he was not talking to her.  (Tr. I, 256.)  Petitioner said he was just scared.  (Tr. I, 159, 256.)  Once again, they did not discuss the details of what happened in her parents' bedroom.  (Tr. I, 256.)  Jessica noted that things returned to normal after that conversation.  (Tr. I, 159.)  She just pretended that it never happened.  (Tr. I, 257.)  Over the next couple of years, Jessica's mother would periodically ask if she was okay and if anything was going on with Petitioner.  (Tr. I, 262-63.)  Jessica would just blow the subject off.  (Tr. I, 263.)

Nothing further happened between Petitioner and Jessica until she entered the fifth grade. (Tr. I, 165.) At this time, the family lived in the Lake Ann house. (Tr. I, 165, 266.) Jessica started to feel uncomfortable around Petitioner because he would call Jessica into his bedroom to sit with him or lie next to him in the morning. (Tr. I, 165-66, 267.) Eventually, Petitioner began to touch Jessica inappropriately. (Tr. I, 268.) It started while Jessica was playing hide-and-go-seek with Petitioner. (Tr. I, 268.) (Tr. I, 165-66.) When he caught Jessica, Petitioner would rub her chest over her clothes. (Tr. I, 165-66.) Jessica never told her mother that Petitioner touched her breasts over her clothing. (Tr. I, 169.)

Jessica's family eventually moved to Peninsula Road when Jessica was in the sixth grade. (Tr. I, 172.) Petitioner began to touch her more often at that house. (Tr. I, 173.) He touched Jessica on top of her clothes, and under her clothes while she was sleeping in her bedroom. (Tr. I, 173.) Petitioner also touched Jessica's vagina beneath her underwear. (Tr. I, 173-74.) After awhile, Petitioner would get on top of Jessica. (Tr. I, 174.) While on top of her, Petitioner would put a pillow over her head and rub his penis against her vagina. (Tr. I, 174.) At times, Petitioner's penis and/or Jessica's vagina was exposed. (Tr. I, 174.) Ultimately, Petitioner penetrated Jessica's vagina with his penis. (Tr. I, 174-75.) Jessica stated that Petitioner's penis did not completely penetrate her but "it hurt really bad." (Tr. I, 175.) Those incidents generally occurred in the afternoon or evening during the summer. (Tr. I, 176.)

On one particular occasion in the summer, Petitioner told the other children to play outside because he was going to help clean the house with Jessica. (Tr. I, 177.) When they were alone, Petitioner threatened to hit Jessica with a broomstick if she did not follow his directions. (Tr. I, 177-78.) He told her to get on his bed, to spread her legs and put a pillow over her face. (Tr. I,

- 7 -

178.)  If Jessica did not spread her legs far enough, Petitioner would tap her foot with the broomstick.  (Tr. I, 178.)  Petitioner would also hit the bed with the broomstick.  (Tr. I, 177, 184.) On that occasion, Petitioner exposed his penis, and moved his groin until his penis was completely up her shorts and had entered her vagina.  (Tr. I, 178-79.)  Jessica did not think Petitioner's penis completely penetrated her vagina but it still hurt.  (Tr. I, 179.)  She could not see anything because she was lying on her back with a pillow over her head.  (Tr. I, 179.)  Jessica testified that this occurred four or five times a week when they lived in the Peninsula Road home.  (Tr. I, 180.) Sometimes she was able to get away.  (Tr. I, 178.)  However, Petitioner penetrated her vagina on at least three occasions.  (Tr. I, 182.)

Jessica lived in the Peninsula Road home from the end of sixth grade until February 2000 of seventh grade.  (Tr. I, 180-81, 197.)  When the broomstick incident occurred, Jessica was twelve years old.  (Tr. I, 181.)  They moved out of the Peninsula Road home when Jessica was thirteen years old.  (Tr. I, 181.)

Many times, Jessica's mother would ask if something was going on with Petitioner. (Tr. I, 183.)  Jessica would just answer "No, mom, I'm - - I'm fine" because she was afraid that she would lose her family.  (Tr. I, 183-84.)   Jessica never spoke with her mom about the details of Petitioner's sexual acts or that Petitioner placed a pillow over her head during the sexual encounters. (Tr. I, 185.)  She only told her mother that "something had happened between us."  (Tr. I, 185.)

In February 2000, Jessica moved from the Peninsula Road home to live with her grandparents near Cincinnati, Ohio.  (Tr. I, 197.)  At that time, Petitioner lived two hours north of Cincinnati.  (Tr. I, 198.)  In the spring of 2000, Jessica's mother moved in with Petitioner.  (Tr. I, 198.)  After Jessica's mother picked up the children for the summer in 2000, Petitioner began to

touch Jessica again.  (Tr. I, 199.)  Petitioner touched Jessica while she was sleeping or he would have Jessica touch him inappropriately.  (Tr. I, 199.)  Petitioner, however, never penetrated Jessica on those occasions.  (Tr. I, 199.)  Petitioner touched Jessica when her mother was not home.  (Tr. I, 199.)

The touching stopped after Petitioner overheard a telephone conversation between Jessica and a friend.  (Tr. I, 200; Tr. II, 352.)  In that conversation, Jessica referred to Petitioner as a jerk.  (Tr. I, 200-01; Tr. II, 352.)  Later that day, Petitioner asked Jessica if she had told her friend about the things he had done.  (Tr. I, 201.)  Although Jessica told him no, she asked Petitioner why he did those things.  (Tr. I, 201.)  Petitioner said he was sorry and it would not happen again.  (Tr. I, 201.)  Petitioner also asked Jessica if she wanted him to go to jail and if she wanted her family torn apart.  (Tr. I, 201-02.)  Petitioner finally requested that Jessica promise that she would never tell anyone about it.  (Tr. I, 202.)  Jessica promised that she would not say anything.  (Tr. I, 202.)  Petitioner never sexually assaulted Jessica after that conversation because Jessica and Tony moved back to their grandparent's house.  (Tr. I, 202-03.)  Brittany and Manda lived with Petitioner and Jessica's mother.  (Tr. I, 203.)

In 2000, after Thanksgiving dinner, Jessica and a friend took a walk.  (Tr. I, 204.)  During the walk, Jessica told her friend about the sexual abuse.  (Tr. I, 203-05; Tr. II, 353.)  Jessica's friend instructed Jessica to talk to her mother.  (Tr. I, 205.)  When they returned to the house, Jessica immediately told her mother that other things happened in Michigan and her mother started to cry.  (Tr. I, 205.)  Jessica was not able to go into the details at that time because her mother was really upset.  (Tr. I, 205.)  Jessica also told her grandmother, Donna Helms, about the sexual abuse allegations.  (Tr. I, 205-06.)

- 9 -

Outside the presence of the jury at the beginning of the second day of trial, Petitioner requested that the trial court remove his attorney.  (Tr. II, 277.)  Petitioner did not agree with the line of questioning pursued by his attorney at the preliminary examination and suggested his attorney had colluded with the prosecutor.  (Tr. II, 278.)  Petitioner's counsel, however, denied colluding with the prosecutor in this case.  (Tr. II, 286.)  After giving Petitioner several warnings about representing himself, the court agreed to allow Petitioner to represent himself.  (Tr. 285-86.)  When the jury was seated, the trial court instructed the jury about Petitioner's decision.  (Tr. II, 293.)  "[Petitioner] has the absolute right to represent himself, if he chooses, and that fact should not affect your decision in any way."  (Tr. II, 293.)

Petitioner then proceeded with the cross-examination of Jessica. Previously, Jessica's grandmother had reported allegations of physical, not sexual, abuse by Petitioner.  (Tr. II, 375-76.)  On October 18, Jessica's grandmother, Donna Helms, called Pat Warden, a social worker, about the allegations of physical abuse by Petitioner.  (Tr. II, 375-76; Tr. III, 369.)  No one knew about the sexual abuse until November 2000.  (Tr. II, 375.)  Jessica first talked to Ohio Detective Monte Mayer regarding the sexual abuse allegations.  (Tr. II, 378-79, 415-16.)  In December 2000, Detective Mayer and Pat Warden came to Jessica's home to discuss the sexual abuse allegations but Jessica did not want to talk to them around her relatives.  (Tr. II, 416.)  About one week later, on December 20, 2000, Jessica met Detective Mayer and Pat Warden at an office for a recorded interview.   (Tr. I, 416.)  Jessica later talked to Michigan Detective Patrick Erway about the time table and locations of the events.  (Tr. II, 417-18.)

Jessica testified that she spent several summers at her grandparent's home.  (Tr. II, 385.)  Petitioner eventually stopped the visits because he thought Jessica's grandparents were a bad

influence on the children.  (Tr. II, 385-86.)  Jessica was angry with Petitioner for stopping the visits because she loved her grandparents and Petitioner did not give any reason for stopping the visits. (Tr. II, 388.)  For three summers, the children did not visit their grandparents.  (Tr. II, 393.)  In February 2000, Jessica moved to Ohio to live with her grandparents.  (Tr. II, 392.)  Jessica's grandparents also urged her mother to leave Petitioner because they did not think that she was in a good environment. (Tr. II, 400.)  Jessica's grandparents never bribed Jessica or Tony to come to live with them.  (Tr. II, 405.)

Jessica's mother permitted her grandparents to obtain custody of Jessica so she could go to school in Ohio.  (Tr. II, 402.)  After Jessica finished school, she spent the summer living with her mother and Petitioner.  (Tr. II, 403.)  At the end of the summer, Jessica and Tony did not want to leave.  (Tr. II, 427-28.)  Jessica blamed Petitioner for having to leave her mother.  (Tr. II, 435.) Jessica chose to live with her grandparents because Petitioner started touching her again.  (Tr. II, 471-72.)  Petitioner was touching her private areas under her clothes.  (Tr. II, 472.)  Jessica denied that Petitioner' sexual abuse was a dream.  (Tr. II, 419.)

Barbara Cross testified next for the prosecution.  (Tr. II, 474.)  Ms. Cross is a mental health therapist in Traverse City.  (Tr. II, 474.)  The trial court admitted Ms. Cross as an expert in the Child Sexual Abuse Accommodation Syndrome.  (Tr. II, 480-81.)  The Child Sexual Abuse Accommodation Syndrome refers to the entrapment that a child experiences when someone she knows or lives with sexually abuses her.  (Tr. II, 481-82.)  As the sexual abuse continues, the child essentially becomes entrapped and keeps the sexual abuse a secret.  (Tr. II, 482.)  It is common for several years to pass before a child will disclose the sexual abuse.  (Tr. II, 483.)  The closer the relationship between the child and the alleged offender, the less likely the sexual abuse will ever be

- 11 -

disclosed.  (Tr. II, 484.)   There are several reasons for children not to disclose sexual abuse, such as being threatened, being requested not to tell, feeling responsible for the disclosure, being told someone would go to jail or people will not believe you, feeling shame or guilt, wanting to protect the family unit, feeling loyalty towards mom, feeling embarrassment and fearing retaliation.  (Tr. II, 486.)  Many times the disclosure of sexual abuse comes from an accidental source, as when a child tells a girlfriend and asks her not to say anything.  (Tr. II, 486.)  Children also will not discuss the sexual abuse if they feel that the mother in the family is unsupportive or unbelieving.  (Tr. II, 487.)  As a result, the molestation may continue, and the child is very unlikely to disclose again.  (Tr. II, 493.)  If a child does disclose again, it is usually to someone who is unrelated.  (Tr. II, 493.)

Barbara Prior, a teacher at the Traverse City Public Schools, testified that she taught Jessica Gaines when she was in the third grade during the 1995-1996 school year.  (Tr. II, 496-97.)  Ms. Prior described Jessica as a very quiet student.  (Tr. II, 499-500.)  Jessica never mentioned any sexual abuse to Ms. Prior.  (Tr. II, 500.)

Patrick Erway, a detective with the Grand Traverse County Sheriff's Office, testified that he investigated Jessica Gaines' sexual abuse allegations.  (Tr. II, 502.)  He became involved in November 2000 after being contacted by Ohio Detective Mayer.  (Tr. II, 502.)  Detective Erway found that both of the locations where the abuse allegedly occurred, 4601 Betsie River Road and 16330 Peninsula Drive, were located in  Grand Traverse County.  (Tr. II, 504-05.)  In December 2000, Detective Erway contacted Jessica about the allegations and to clarify the locations and dates of the sexual abuse. (Tr. II, 510-11.)  Detective Erway also contacted Ohio Detective Mayer to assist with the investigation of Jessica's allegations, because she was living in Ohio at the time.  (Tr. II, 512.)  Pat Warden, a Butler County Social Worker, also contacted Detective Erway to discuss the

case.  (Tr. II, 513.)  As part of the investigation, Detective Erway requested a doctor to examine

Jessica.  (Tr. III, 575.)  The results of the doctor's examination, however, were inconclusive.  (Tr.

III, 579-80.)  Detective Erway also set up an interview between Jessica and Ohio Detective Monte

Mayer and Pat Warden.  (Tr. III, 626.)

　　　　　While Detective Erway was not familiar with any other sexual abuse claims against

Petitioner, he was aware of an investigation of physical abuse involving Jessica's brother, Tony

Zimmer.  (Tr. III, 590, 596.)  No charges were brought in that case.  (Tr. III, 592.)  According to the

August 2000 Ohio Protective Services Report by Patricia Warden, Tony claimed that Petitioner tied

him to his bed to prevent him from getting up at night when he was two years old. (Tr. III, 610-12,

621.) Tony also stated that he was locked in his room with a potty chair, and if he wet his pants

Petitioner would beat him.  (Tr. III, 612.)  Because Tony refused to disclose the physical abuse when

pursued by law enforcement, no charges were ever brought against Petitioner.  (Tr. III, 600, 622.)

　　　　　Pat Warden, a Butler County Children's Services Social Worker, testified that she

first became involved with family in August 2000 after a referral from the Cincinnati Children's

Hospital because of Tony's allegations of physical abuse.  (Tr. III, 629, 631, 639-40.)  Warden knew

that the children's grandparents, Donna and Don Helms, had custody of the children since April

2000.  (Tr. III, 657.)  Eventually Warden closed the physical abuse investigation because she could

not locate Petitioner or Tony's mother, Gina Smith.  (Tr. III, 643.)

　　　　　Pat Warden received a second referral on October 18, 2000.  (Tr. III, 645.)  That

referral came from Jessica's grandmother, Donna Helms, because she had located Petitioner and

Gina.  (Tr. III, 645.)  Since Petitioner and Gina were no longer together, Tony wanted to talk to

Warden and press charges.  (Tr. III, 645.)  On November 8, Warden talked to Gina Smith on the

- 13 -

telephone.  (Tr. III, 672-73.)  During that conversation, Warden learned that Petitioner had made Jessica touch his private parts.  (Tr. III, 673-74.)  Warden had also learned from Donna Helms previously about the inappropriate touching between Petitioner and Jessica. (Tr. II, 673-74.) Jessica, however, had not yet disclosed the sexual abuse allegations.  (Tr. III, 674.)

On November 24, Warden received a voice mail message from Donna regarding Jessica.  (Tr. III, 646.)  When Warden returned Donna's phone call, she learned that Petitioner had been sexually abusing Jessica.  (Tr. III, 646.)  At that time, she contacted the police and spoke with Michigan Detective Erway.  (Tr. III, 647.)  Warden and Ohio Detective Mayer met with Jessica at her grandparent's home on December 14.  (Tr. III, 648, 697-98.)  Jessica had several questions regarding the procedures of reporting the sexual abuse but they did not address the specific allegations during that interview.  (Tr. III, 648, 698.)  On December 20, Jessica, Warden and Ohio Detective Mayer met at the Children's Services' office to discuss the allegations.  (Tr. III, 648-49, 694.)  They also taped that interview. (Tr. III, 649.)  Warden testified that she did not think anyone helped Jessica with her allegations. (Tr. III, 656.)

Monte Mayer, a detective with the Butler County Sheriff's Office, testified that he investigated Jessica's allegations of sexual abuse by Petitioner.  (Tr. III, 703-04.)  Detective Mayer first became involved in the case in December 2000.  (Tr. III, 704.)  Detective Mayer interviewed Jessica on December 20 with Pat Warden at the Children's Services' office.  (Tr. III, 705, 707.)  He previously had gone to Jessica's home for an interview but Jessica refused to talk about the sexual abuse allegations at that time.  (Tr. III, 706-07.)  Jessica indicated that she did not want to talk where her grandma or her brother could overhear their conversation.  (Tr. III, 706.)  Detective Mayer taped

the December 20 interview with Jessica. (Tr. III, 711.)  At that interview, Jessica was very somber and matter of fact as if she had removed herself from the situation. (Tr. III, 717-18.)

Gina Smith, Jessica's mother, testified that she is married to Petitioner. (Tr. III, 719, 721.)  Petitioner moved in with Gina when Jessica was two years old and Tony was one and one-half years old. (Tr. III, 721-22.)  Petitioner never adopted Jessica or Tony. (Tr. III, 735.)  They moved to the Betsie River Road house in 1995 when Jessica was in the second grade. (Tr. III, 724-25.)  The family lived at that address for three years. (Tr. III, 725.)  After moving a few times after the Betsie River Road house, they eventually settled into a house on Peninsula Drive on January 17, 1999, when Jessica was twelve years old. (Tr. III, 725-28.)  The family lived in that house until February 2000. (Tr. III, 726-27.)

When Jessica was nine years old, Gina became aware of the sexual contact between Petitioner and Jessica. (Tr. III, 728.)  They were living on Betsie River Road. (Tr. III, 728.)  While Gina was braiding Jessica's hair for school, Petitioner came out of the bedroom crying and shaking because he had something to tell her. (Tr. III, 728-29.)  Petitioner hesitated to tell Gina what was wrong but he instructed her not to send the children to school. (Tr. III, 729.)  He told the children to go to their rooms, but Jessica remained in the room. (Tr. III, 729-30.)  Petitioner explained to Gina that he was lying in bed and he thought Jessica was actually Gina. (Tr. III, 730.)  Petitioner said that he had Jessica touch him while he masturbated. (Tr. III, 730.)  Petitioner told Gina that he did not have intercourse with Jessica and it would never happen again. (Tr. III, 730, 737.)

On the night of this incident, Gina had slept in a chair in the living room. (Tr. III, 732.)  Jessica was sleeping in Gina and Petitioner's bedroom because Jessica had been fighting with her siblings. (Tr. III, 732.)   She wanted to sleep in her parent's bed until her siblings fell asleep.

- 15 -

(Tr. III, 732.)  When Petitioner came home that night, Gina noticed that Petitioner was intoxicated. (Tr. III, 731-32.)

After Petitioner's disclosure, all of the children stayed home from school.  (Tr. III, 733.)  Jessica left the house twice that day.  (Tr. III, 733.)  First, Jessica and Gina went to the store. (Tr. III, 734.)  Gina asked Jessica what she wanted her to do.  (Tr. III, 734.)  Jessica was crying and frightened.  (Tr. III, 735-36.)  Gina told Jessica that she would take all of the children out of there. (Tr. III, 736.)  Jessica replied that she did not want to break up the family.  (Tr. III, 736.)  Gina eventually told her mother, Donna Helms, what Petitioner had done to Jessica when the family was living on Peninsula Road.  (Tr. III, 737.)  Jessica also left with Petitioner that day to go to McDonald's.  (Tr. III, 733.)

Petitioner acted differently around Jessica after that night.  (Tr. III, 737.)  Gina asked Jessica every couple of months if Petitioner was doing anything of a sexual nature to her.  (Tr. III, 738-39.)  Gina kept on asking Jessica if Petitioner was touching her because she  had "bad feelings." (Tr. III, 742.)  Gina became aware of other sexual abuse allegations by Jessica on Thanksgiving night of 2000.  (Tr. III, 742-43.)  Jessica said "[d]o you remember what dad did to me?" (Tr. III, 743.) Gina replied "[y]es, I do."  (Tr. III, 743.)  Jessica stated "[w]ell, he didn't stop."  (Tr. III, 743.) Jessica was very upset when she made those allegations.  (Tr. III, 743.)  While Gina tried to obtain more information from Jessica, she was not successful.  (Tr. III, 744.)  Donna then called Child Protective Services to report the sexual abuse.  (Tr. III, 744.)

Gina also testified that her parents never liked Petitioner.  (Tr. III, 751.)  She further testified that there were allegations that Jessica's biological father abused Jessica.  (Tr. III, 753-54.) Gina hated Petitioner when he stopped Jessica and Tony's visits with their grandparents.  (Tr. III,

757-58.)  Gina did not leave Petitioner after the 1996 incident because Petitioner convinced her that he would never do it again.  (Tr. III, 791-92.)  She also did not want to split up her family.  (Tr. III, 792.)  Petitioner also threatened Gina that he would he would get Gina if she left him.  (Tr. III, 798.)  When Gina and Petitioner separated, Gina testified that Petitioner did not come and get her.  (Tr. III, 800.)  Gina also told Petitioner that she would do anything to get her children back.  (Tr. III, 793.)

On redirect cross-examination, Gina explained that she left Jessica's biological father because he was physically abusing Jessica.  (Tr. III, 795.)  Gina stated that she never encouraged Jessica to make up allegations of sexual abuse by Petitioner.  (Tr. III, 796.)

Donna Helms, Gina Smith's step-mother, testified that she had a close relationship with Jessica even though they were not related.  (Tr. III, 802.)  Donna stated that she never encouraged any of her grandchildren to make up false accusations of sexual abuse. (Tr. III, 803.)  While she and Don Helms are divorced, they still live in the same house.  (Tr. III, 804.)  The children and Gina came down to live with Donna and Don in February.  (Tr. III, 807.)  Gina went back to Petitioner in March.  (Tr. III, 807.)  Donna did not get along with Petitioner.  (Tr. III, 812.)

The prosecution recalled Gina Smith to testify.  (Tr. III, 816, 832.)  Gina stated that she was present at the preliminary examination when Jessica testified that Petitioner placed a pillow over her head.  (Tr. III, 832-33.)  Gina was surprised to hear Jessica's testimony that Petitioner placed a pillow over her head during intercourse.  (Tr. III, 833.)  Petitioner would place a pillow over Gina's head about half of the time that they had intercourse.  (Tr. III, 833.)  Jessica never knew about the sexual relations between Gina and Petitioner.  (Tr. III, 833.)  Petitioner would place the pillow over Gina's head periodically throughout their marriage.  (Tr. III, 834.)  Gina did not tell anyone

- 17 -

about the pillow incidents until she heard Jessica mention it at the preliminary examination. (Tr. III,

833, 835.)

The prosecution rested. (Tr. III, 842.)

The defense did not present any witnesses and rested its case. (Tr. IV, 878-79.)

At the conclusion of the trial, on June 11, 2002, the jury found Petitioner guilty of two

counts of criminal sexual conduct in the first-degree. (Tr. IV, 951-52.) On June 28, 2002, Petitioner

was sentenced to concurrent prison terms of two hundred and eighty-five months to sixty years and

thirty to sixty years as a third habitual offender. (June 28, 2002 Sentencing Tr., 34-35, docket #35.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which

was filed by counsel, raised the following claims:

I.     Did the trial court err by failing to advise [Petitioner] properly and by failing to determine if [Petitioner's] waiver was intelligently and voluntarily made, upon [Petitioner's] request to waive his right to counsel and discharge his attorney and represent himself?

II.    Did the trial court err, as a matter of law, by overruling [Petitioner's] objection to the introduction of testimony of similar sexual acts committed with complainant's mother, holding that such acts were not evidence of [Petitioner's] character or character traits and not, therefore, subject to the notice provisions of MRE 404(b)(2)?

(Def.-Appellant's Br. on Appeal to Mich. Ct. of Appeals at iv, docket #36.) Petitioner filed a

supplemental *pro se* brief to the Michigan Court of Appeals with two additional claims:

III.   Is the weight of evidence sufficient to prove beyond a reasonable doubt all the elements of the crime in which the [Petitioner] was charged, and convicted.

IV.    Is the conviction a miscarriage manifest of justice and does the conviction violate the Due Process Clause?

- 18 -

(Standard 11 Supplemental Br. on Appeal to Mich. Ct. of Appeals at 23, docket #36.)  By
unpublished opinion issued on May 11, 2004, the Michigan Court of Appeals rejected all of
Petitioner's arguments and affirmed his convictions and sentences.  (*See* 5/11/04 Mich. Ct. App. Op.
(MCOA), docket #36.)  Petitioner filed a proper application for leave to appeal to the Michigan
Supreme Court, raising claims I, II and III from his court of appeals' brief and the following two
claims:

> I.  Trial court violated [Petitioner's] confrontation rights under the [U]nited
>     [S]tates 6th [A]mendment, when it abused it's discretion and entered []
>     [D]octor Kathi Makoff's report and stating that "the lack of physical findings
>     did not rule out the possibility of sexual abuse[.]"  And by failing to produce
>     the doctor to testify to that, is plain error and violates [the] 5th 6th and 14th
>     [A]mendments, due process, confrontation right, equal protection right,[and]
>     right to an impartial jury.
>
> II. Ineffective assistance of trial counsel.  Trial counsel was ineffective during
>     the preliminary and all the way up to the second day of trial. Wherefore
>     [Petitioner] was forced to proceed pro-se, at the start of the second day of
>     trial.

(Def.-Appellant's Br. on Appeal to Mich. Supreme Court at 2-8, docket #37.)  By order entered
February 28, 2005, the Michigan Supreme Court denied Petitioner's application for leave to appeal
because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord.,
docket #37.)

On or about April 22, 2005, Petitioner filed an application for habeas corpus relief
in *Smith v. Konteh*, Case No. 1:05-cv-300 (W.D. Mich.), asserting six grounds for habeas relief, three
of which were unexhausted.  This Court dismissed Petitioner's application for habeas relief without
prejudice as a "mixed petition," i.e. a petition asserting both exhausted and unexhausted claims, for
failure to exhaust his available state-court remedies on June 8, 2005. *Smith*, Case No. 1:05-cv-300

- 19 -

(W.D. Mich. June 8, 2005), Op. & J., docket ##7-8; *see Rose v. Lundy*, 455 U.S. 509, 22 (1982) (directing district courts to dismiss mixed petitions without prejudice in order to allow petitioners to return to state court to exhaust remedies). Instead of filing a motion for relief from judgment in state court to exhaust his unexhausted claims, Petitioner dropped his unexhausted claims and elected to proceed with the following three claims in his *pro se* first amended petition as stated verbatim (docket #5):

I.     PETITIONER'S WAIVER OF HIS RIGHT TO COUNSEL ON SECOND DAY OF TRIAL WAS NOT MADE KNOWINGLY INTELLIGENTLY VOLUNTARILY. THUS VIOLATING PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHT TO COUNSEL. U.S.C.A. 6, 14.

II.    FAILURE OF PROSECUTOR TO DISCLOSE HIS INTENT TO OFFER "OTHER ACTS" EVIDENCE. THUS, VIOLATING PETITIONER'S SIXTH AMENDMENT RIGHT TO CALL WITNESSES IN HIS FAVOR TO REBUT THE PROSECUTION CASE IN CHIEF AS WELL AS VIOLATED THE PETITIONER'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS, EQUAL PROTECTION OF THE LAW AND THE RIGHT TO A FAIR TRIAL AND AN IMPARTIAL JURY AS WELL AS A BRADY VIOLATION.

III.   INSUFFICIENT EVIDENCE.

(*See* First Am. Pet. at 6-7, 9; docket #5).

On November 30, 2006, Petitioner filed a motion to amend his first amended petition to add a Sixth Amendment claim for ineffective assistance of counsel as it relates to the "voluntary waiver of his right to counsel." (Mot. at 7, docket #48.) By memorandum opinion and order (docket ##49-50), this Court granted Petitioner's motion to supplement his first ground for habeas corpus relief with a claim for ineffective assistance of counsel as it relates to the "voluntary" waiver of his right to counsel, but denied Petitioner's motion to add unexhausted constitutional claims. (Order, docket #50.) On September 20, 2007, Petitioner filed a motion to expand the record (docket #63)

with Jessica Gaines' December 20, 2000 interview transcript to support his first ground for habeas corpus relief.  This Court granted Petitioner's motion to expand the record on May 22, 2008 (docket #67).

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing

the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.

This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

<u>Discussion</u>

I.        <u>Waiver of Right to Counsel</u>

On the morning of the second day of trial, Petitioner addressed the trial court, "asking to have [his] attorney withdraw from counsel. . . . I would proceed on the rest of my -- on the rest of my trial." (Tr. II, 277.) The court asked Petitioner if he wished to represent himself during the remainder of the trial, and Petitioner said, "Yes, sir." (Tr. II, 277-78.) At this point in the trial, the victim already had completed direct examination, and defense counsel had begun cross-examination. As reasons for his decision to represent himself, Petitioner discussed his dissatisfaction with a line of questioning pursued by his attorney at the preliminary examination. Specifically, he complained that his attorney had "asked the victim, the alleged victim, [] a line of questions that she had answered to the tee of the testimony she gave on 12-20 of 00, 2000 . . . ," referring to the date of the victim's recorded interview with Detective Monte Mayer. (Tr. II, 278.) Petitioner argued that the questions followed "word-for-word" the order of questions put by Detective Mayer. (Tr. II, 278.) He argued that, because the taped interview was not released in discovery materials until after the preliminary examination, there was no way for defense counsel to have been able to so closely track the questions put by the detective. (Tr. II, 279.) Petitioner implied that defense counsel was in

- 23 -

collusion with the prosecutor, an implication the trial court appeared not to understand but that was understood by defense counsel.  (Tr. II, 279-80, 286-87.)[3]

The trial court then instructed Petitioner concerning the difficulties of self-representation:

THE COURT:  Okay.  What we're going to do is if you want to represent yourself, you have the right to do that.  I have to give you the piece of advice again, you already heard it but I have to give it to you again, I'm required by law to do this, to tell you that it is a poor idea to represent yourself, that you need to have someone.

THE DEFENDANT:  Well, –

THE COURT:  Now, let me finish the advice, I've got to do this so that it doesn't get reversed on appeal, in the event there's a conviction, but I have to do this. I have to advise you that it's a bad idea to represent yourself, that an attorney is helpful in understanding how to do these things, that people who represent themselves are so involved in the case personally that they can't see the facts in a – in an objective way and they don't do a good job.  Attorneys representing themselves don't do a good job, attorneys are told that you shouldn't represent yourself in a legal proceeding.  And the old saying is that, "An attorney who represents himself has a fool for a client."

It is, however, your right to represent yourself, if you wish.  And what we'll do, if you would like to do that, is Mr. Hall will sit there and be available to consult with you, to the extent you wish to use him.  If you don't want to talk to him, then that's your privilege, also.  So we can go that way, if you'd like.

THE DEFENDANT:  That would be fine, Your Honor, but I would request if we do that that he says nothing unless I ask him for his –

. . .

THE COURT:  Let me make sure I understand so he understands the ground rules.  You don't want him to make objections for you, right?  Do you want him to touch your elbow and speak to you when he sees a problem?

---

[3]Petitioner now expressly argues that defense counsel colluded with the police and prosecution, and he filed a motion to expand the record to include the recorded statement made by the victim to the police.  (Docket #63.)

THE DEFENDANT:  No, no, because the rest of the information I get, it will be in the hands of the Jury that I give out.  Now, as I – as you know, I'm not – I'm not experienced at this.

THE COURT:  Yeah, and let me tell you another thing, think of the Jury.  Now, the Jury's made up of regular people and they see you representing yourself –

THE DEFENDANT:  Exactly.

THE COURT:  – and to be honest with you, you're not going to look good.  I'm just telling you that.

THE DEFENDANT:  I know that, Your Honor.  I already don't look good.

THE COURT:  And they're going to – I mean I'll even instruct them that they shouldn't consider that, they should only consider the evidence, but when it comes right down to it, this is going to hurt you.  Now, you have the right to do that, it's your case.  If things go wrong, you're the one that pays the price, so it's your privilege, –

THE DEFENDANT:  Okay.

THE COURT:  – but you need to understand that.

Now, in terms of Mr. Hall's role, do you want him, if he sees something that's going on that should be objected to, to tap you on the arm and speak to you and then are you going to object or do you want him just to sit there and wait until you speak to him?

THE DEFENDANT:  I'd just rather have him sit there, Your Honor, at this point.

THE COURT:  All right.

THE DEFENDANT:  I have not been advised very well on his line of questioning.  I believe it's going to be –

THE COURT:  All right.  So, fine, he won't say a word and he'll only speak to you if you ask him or speak to him about something.  Is that what you want?

THE DEFENDANT:  Your Honor, I –

THE COURT:  Now hold it [].  I asked you a question.

- 25 -

THE DEFENDANT:  That is what I want, yes, sir.

(Tr. II, 281-83.)  The court proceeded to instruct Petitioner about the kinds of questions he could ask

and the form his questions should take.  (Tr. II, 284-86.)  Shortly before bringing in the jury, the

court once again instructed Petitioner about the potential consequences of his decision:

> THE COURT:  You'll just ask questions and I'll – if you do that, I'll try to
> help you with the technicalities.  You're a lay person, but, again, that's no substitute
> for having a lawyer, you're making a mistake, but it's your privilege for asking to do
> that.

(Tr. II, 286.)  Notwithstanding the court's advice, Petitioner proceeded to represent himself at trial.

On appeal, Petitioner challenged his waiver of counsel on several bases.  First, he

argued that his waiver of the right to counsel was not valid under state law because the trial court did

not precisely comply with MICH. CT. R. 6.005(1), which required the court to advise Petitioner of

the charge and the maximum prison sentence at the time he waived his right to counsel.  Second, he

argued that the court's colloquy was not adequate under either the federal or state constitution to

inform Petitioner of the disadvantages of self-representation.  Third, he claimed that his decision to

represent himself was not made knowingly or voluntarily because he was not mentally competent

to make such a decision.

The Michigan Court of Appeals thoroughly addressed all prongs of Petitioner's

argument.  The court analyzed both federal and state constitutional law and discussed the

requirements of the Michigan Court Rule.  The court held that Petitioner had substantially complied

with the requirements of MICH. CT. R. 6.005.  (5/11/04 Mich. Ct. App. Op. at 2.)  In addition, the

court of appeals concluded that the trial judge's advice met the advice requirements for self-

representation:

We find that the record establishes the trial court substantially complied with the advice requirements for self-representation.  The court engaged in a short colloquy with defendant concerning the risks of self-representation and defendant acknowledged that he understood the risks of going forward without an attorney, but stated that he wanted to proceed with the trial on his own, in his own manner. Additionally, we note that in a more recent decision, this Court in [*People v.*] *Hicks* [675 N.W.2d 599 (Mich. Ct. App. 2003)], held that a trial judge's statements that the defendant would have to follow the rules of court, that self-representation would be "very unwise," and that "a man who represents himself has a fool for a client," adequately informed the defendant of the risks of self-representation.  *Hicks, supra,* 259 Mich App at 531.  The similarity of the remarks between the present case and *Hicks*, warrant a finding that the trial court did not commit error here.

(*Id.* at 3.)  Finally, the court of appeals rejected Petitioner's claim that he was not competent to make the decision to represent himself.  Citing *Godinez v. Moran*, 509 U.S. 389, 401 (1993), the court held that "[t]he test for a defendant's competency to waive counsel is whether the defendant has the ability to understand the proceedings." (Mich. Ct. App. Op. at 3)  Applying that standard, the court of appeals found as follows:

In this case, although we observe that defendant's reasons for wanting to represent himself were inarticulately conveyed, the dialogue between the court and defendant reflect defendant's knowledge of the importance of credibility.  Defendant challenged the methodology of his counsel's cross-examination because the methodology did not lend itself to an attack on the victim's credibility.  Defendant also repeatedly acknowledged that he understood the risks of going forward without an attorney but stated that he wanted to proceed with the trial on his own.  Defendant also acknowledged that he would have to follow courtroom rules and decorum.  He demonstrated a basic understanding of cross-examination when he acknowledged that he understood he could not ask the victim if she had ever had sex before on cross-examination.  Therefore, we find defendant knowingly, intelligently, and voluntarily made the assertion to represent himself because he demonstrated a clear understanding of the proceedings and a clear understanding of the court's advice concerning those proceedings.

(*Id.*)

Petitioner makes the same arguments in his habeas petition as he made in the Michigan Court of Appeals.  His first argument, that the waiver was conducted in violation of MICH.

- 27 -

CT. R. 6.005, is not cognizable in this proceeding. A federal court may entertain an application for

habeas relief on behalf of a person in custody pursuant to the judgment of a State court in violation

of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A habeas petition

must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431

U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS

CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of

state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Petitioner next argues that the trial court's advice on the dangers of self-representation

was inadequate to support a valid waiver. The Supreme Court has held that the Sixth and Fourteenth

Amendments guarantee a criminal defendant both the right to present his own defense and the right

to be represented by counsel. *Faretta v. California*, 422 U.S. 806, 833-34 (1975). By electing to

exercise his constitutional right to present his own defense, a defendant necessarily waives his

constitutional right to be represented by counsel. *United States v. Mosley*, 810 F.2d 93, 97 (6th Cir.

1987) ("'The right to defend pro se and the right to counsel have been aptly described as "two faces

of the same coin," in that waiver of one right constitutes a correlative assertion of the other.'"

(quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir.1970))); *see also United States v.*

*Cromer*, 389 F.3d 662, 680 (6th Cir. 2004). This waiver of counsel must be knowing and intelligent.

*Faretta*, 422 U.S. at 835; *Peters v. Chandler*, 292 F. App'x 453, 457 (6th Cir. 2008). A defendant

first must clearly and unequivocally demand to proceed *pro se*. *Peters*, 292 F. App'x at 457 (citing

*Cromer*, 389 F.3d at 682-83); *Robards v. Rees*, 789 F.2d 379, 383 (6th Cir. 1986). Once a defendant

has clearly asserted the right to self-representation, the court must conduct a hearing to ensure that

the defendant is fully aware of its dangers and disadvantages. *See Moore v. Haviland*, 531 F.3d 393,

402 (6th Cir. 2008); *Coleman v. Mitchell*, 268 F.3d 417, 449 (6th Cir. 2001) (where the state trial court does not inform the petitioner of the disadvantages of self-representation, the petitioner's waiver of counsel is not knowing and voluntary); *Fowler v. Collins*, 253 F.3d 244, 249-50 (6th Cir. 2001) (same).

Petitioner does not dispute that he clearly and unequivocally asserted his right to represent himself. On more than one occasion, he advised the trial court of his intention to represent himself. He claims, however, that his waiver was not valid because the trial court's advice concerning the dangers of self-representation too vague to make him truly aware of the risks of self-representation.

Upon review, I conclude that the court of appeals reasonably applied clearly established Supreme Court precedent to determine that the trial court's advice was adequate to place Petitioner on notice of the dangers of self-representation.[4] The trial court clearly and repeatedly advised Petitioner that it was a bad idea to represent himself, giving numerous reasons: an attorney is helpful in understanding how to present a case; a person charged with a crime is not objective and is likely to make poor decisions; even attorneys are at a disadvantage when representing themselves; jurors may make a negative judgment about an individual who is representing himself, notwithstanding an instruction to the contrary; and an attorney understands the intricacies of trial procedure by which Petitioner will be bound. (Tr. II, 281-83, 286.) The court's advice was repeated on several occasions as the court inquired about whether Petitioner wished to have counsel available

---

[4]In the first part of its decision, the court of appeals discussed the right to self-representation under the United States Constitution, citing *Martinez v. Court of Appeals of Cal.*, 528 U.S. 152 (2000). Thereafter, the court discussed the standards set forth in *People v. Hicks*, 675 N.W.2d 599 (Mich. Ct. App. 2003). The *Hicks* case relied on the federal legal principle set forth in *Faretta*, 422 U.S. 806, and cited Michigan cases thoroughly discussing federal legal precedent. The court of appeals therefore clearly applied established Supreme Court precedent in reaching its decision.

to assist him or make suggestions. The trial court's discussion was more than adequate to place Petitioner on notice of the dangers and disadvantages of representing himself. In addition, although the trial court did not again remind Petitioner of the maximum sentence he faced, Petitioner previously had been advised of the nature and seriousness of the charges against him at arraignment in the district court, at the preliminary examination, and at the circuit court arraignment. Moreover, Petitioner repeatedly acknowledged that he understood the risks of going forward. The state-court determination therefore did not constitute an unreasonable application of established Supreme Court precedent.

Petitioner next argues, as he did in the Michigan Court of Appeals, that his waiver was invalid because he was incompetent to waive counsel. The court of appeals correctly cited the applicable standard for reviewing a claim that a defendant lacks competency. *See Godinez v. Moran*, 509 U.S. 389, 401 (1993) (holding that the standard for evaluating competency for purposes of waiving the right to counsel is the same as the standard for standing trial). Moreover, the court made specific factual findings about Petitioner's understanding of the risks going forward, concluding that his responses demonstrated an understanding of the importance of witness credibility, a familiarity with the fundamentals of cross-examination, and awareness of his obligation to follow courtroom rules and procedures. Those findings are entitled to a presumption of correctness and will not be overturned absent clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429. Petitioner has identified nothing in the record that would call the appellate court's factual findings into question.

In his habeas application, Petitioner raises two arguments not raised in his state-court appeals.[5]   First, Petitioner alleges that, while he asserted his right to self-representation, his invocation of the right was not truly voluntary because he was given the impossible choice of deciding between being represented by an attorney who was rendering ineffective assistance or representing himself.  He asserts that he was entitled to a determination on the question of whether his attorney's performance was effective and, once such a finding was made, he should have been given a new attorney.  In support of this contention, he cites *United States v. Padilla*, 819 F.2d 952, 955 (10th Cir. 1987) ("A defendant forced to choose between incompetent or unprepared counsel and appearing pro se faces 'a dilemma of constitutional magnitude.'") (quoting *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir. 1976)).

Petitioner's argument is meritless.  Unlike *Padilla*, Petitioner was not placed in an unconstitutional dilemma.  The trial court never insisted that Petitioner proceed with his present attorney or none at all.  At no time did Petitioner request that the court appoint new counsel, and the trial court at no time denied substitute counsel.  Instead, Petitioner made vague allegations about his attorney's allegedly deficient performance solely for the purpose of explaining his intention to

---

[5]Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.  *Duncan*, 513 U.S. at 365-66; *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.  However, an application for writ of habeas corpus may be denied on the merits, notwithstanding the failure to exhaust.  28 U.S.C. § 2254(b)(2).  Because the claims lack merit, the Court will dispose of both issues without first requiring exhaustion.

represent himself. Petitioner clearly and unequivocally sought only one thing: to represent himself. *Padilla* therefore is inapplicable to the instant case.

Further, *Padilla* is a decision of a federal appellate court. In determining whether to grant habeas relief, this Court may consider only the "clearly established" holdings of the Supreme Court. *Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655. Habeas relief therefore is not available for any violation of *Padilla*.

Finally, notwithstanding Petitioner's lengthy arguments about the quality of his attorney's representation, Petitioner fails to demonstrate that counsel provided ineffective assistance warranting his removal from the case. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled

- 32 -

to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

Petitioner argued in the trial court that his attorney's representation at the preliminary examination was deficient because it merely brought out the victim's story and ostensibly advantaged the prosecution.  A review of the preliminary examination transcript reveals that counsel carefully questioned the victim about the details of the alleged assaults in an attempt to obtain answers that conflicted with her prior statements or which could be used for cross-examination purposes at trial.  The mere fact that he did not lead the victim to change her story does not render his questioning an inappropriate trial strategy.  Petitioner apparently does not recognize that appropriate cross-examination strategy at a preliminary examination is often different from strategy at trial.  Most Michigan defense attorneys use the preliminary examination as a discovery tool and as an opportunity to pin down a witness's story, to prepare for impeachment at trial.  Cross-examination strategy at the preliminary examination is often exploratory and open-ended and does not resemble a trial cross-examination.  Further, despite Petitioner's characterization of counsel's performance as demonstrating collusion with the prosecutor, no evidence of collusion exists in the record of the case.  Instead, Petitioner has presented only arguments reflecting his disagreement with his attorney's trial strategy.  Such a disagreement does not constitute the ineffective assistance of counsel.  Moreover, because the preliminary examination was not presented to the jury, counsel's strategy at that proceeding could not have prejudiced Petitioner.

Petitioner also argues for the first time on habeas review that two separate waiver procedures should have been conducted. First, he argues that in order to waive representation by his attorney, voluntariness should be evaluated under *Johnson v. Zerbst*, 304 U.S. 458 (1938). He argues that only after the court had determined that the waiver of counsel was voluntary, should the *Faretta* analysis have been applied. Petitioner's argument is wholly unsupported by case law. The Sixth Circuit routinely has recognized that, by electing to exercise his constitutional right to present his own defense, a defendant necessarily waives his constitutional right to be represented by counsel. *Mosley*, 810 F.2d at 97; *Cromer*, 389 F.3d at 680. Indeed, in *Faretta*, the Court expressly incorporated the waiver standard set forth in *Johnson*, holding that an individual seeking to represent himself must knowingly and intelligently forego the traditional benefits associated with the right to counsel. *Faretta*, 422 U.S. at 835 (citing *Johnson*, 304 U.S. at 464-65). As previously discussed, the trial court provided appropriate warnings under *Faretta*, and Petitioner knowingly, voluntarily and intelligently exercised his right to self-representation and waived his right to counsel. Thus, Petitioner properly waived his right to counsel.

## II.  Evidentiary Claims

In his second ground for habeas corpus relief, Petitioner presents several challenges to the admission of "other acts" evidence by his wife, Gina Smith. Petitioner submitted the following claim to the Michigan appellate courts:

> Did the trial court err, as a matter of law, by overruling [Petitioner's] objection to the introduction of testimony of similar sexual acts committed with complainant's mother, holding that such acts were not evidence of [Petitioner's] character or character traits and not, therefore, subject to the notice provisions of MRE 404(b)(2)?

(Def.-Appellant's Br. on Appeal to Mich. Ct. of Appeals at iv, docket #36.)   In supporting materials to his habeas petition, Petitioner attempts to embellish this state-law evidentiary issue by couching it as a series of constitutional claims, none of which were presented to the state courts.   This report and recommendation has elsewhere chronicled Petitioner's relentless attempts to inject unexhausted claims into this case.   The gravamen of these constitutional claims is that the trial court violated Mich. Rule Evid. 404(b), which required previous notice that the prosecutor would introduce "prior bad acts" evidence.   Because Petitioner did not receive notice of the similar sexual acts evidence, he argues that he was denied his rights under the Fifth, Sixth and Fourteenth Amendments. Petitioner also alleges prosecutorial misconduct and a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).   Because these constitutional claims, although unexhausted, are facially meritless, the Court may ignore the lack of exhaustion and dismiss them on their merits.   28 U.S.C. § 2254(b)(2).

During direct examination, the victim, Jessica Gaines, testified that Petitioner placed a pillow over her head during a sexual assault.   (Tr. I, 174.)   The prosecutor also questioned Jessica regarding her mother's knowledge of the pillow incident as follows:

> Q    Okay.  Did you ever tell [your mother] about [Petitioner] pulling a pillow over your head?
> A    No,  I never told my mother any of what had happened between my father and I, except for that something had happened between us.
> Q    Did you ever have any reason to know that you father would sometimes put a pillow over your mother's head during sex?
> Mr. Hall: Objection, relevance, lack of foundation.

(Tr. I, 185.)   The Court then excused the jury.   After discussing several evidentiary issues, the trial court held that they would not rule on the admissibility of the testimony until Jessica's mother, Gina Smith, testified.   (Tr. I, 196-97.)

At the end of Donna Helms testimony, the prosecution renewed its arguments, outside of the presence of the jury, to admit Gina Smith's testimony regarding the pillow incidents. After hearing the arguments by the prosecution and defense, and Gina Smith's proposed testimony, the trial court found:

> If evidence comes under 404(B), the Prosecution under 404(B)(2) is required to provide, quote, reasonable notice in advance of trial or during trial, if there's good cause shown, of the nature of the evidence to permit the Defendant to prepare for it. So if we're under 404(B), we - - we really have a problem, because there was no notice of this until basically when the trial started.

> However, 404(B) only applies to evidence that is introduced to establish in this case the Defendant's character and then to establish that he acted in conformity with that character. And I don't - - I don't - - the question is what is character? And I take that to be some innate - - something innate to the person that has them act in a certain way. And it seems to me that this evidence is not offered to show that the Defendant show anything about his character. What is testified to, there's nothing bad about it or it has anything bad to do with character has anything to do with character, so far as I can tell. Consensual sexual practices between partners in marriage don't all have to be missionary position sex and I don't think the Jury's going to view this as a character issue at all. I think it doesn't come under 404(B), I don't think that it  - - it is offered in order to establish character, and, therefore, 404(B) and the requirements and notice requirements therein are not applicable.

> I think we can go just to general concepts of relevancy and under Rule 401, "Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the acts - - of the accident - - pardon me, determination of the acts more or less probable than it would be without the evidence." It seems to me that with the evidence, if the Jury chooses to believe it, that the Defendant and Gina Smith engaged in consensual - - in their marital sex with a pillow over her face at least half the time, if they choose to believe that, then it does make it more likely that the victim, alleged victim, is being truthful, when she reports the very same kind of incidents with the Defendant so I think it is relevant.

> Now, Mr. Hall raises MRE 403, which says that, although - - although relevant evidence may be excluded, if excluded if its probative value is substantially outweighed by unfair prejudice and other factors. I don't see any real unfair prejudice. I don't see anything about the practice that Gina Smith described as being immoral or reprehensible or such that it would make the Jury look down on the Defendant. I mean people in marriage have their own sexual practices and - - I don't

think that - - that the Jury's going to hold this against anybody.  And its probative value - - it does have some probative value, assuming the Jury believes it.  So I'm going to admit it and find it does not need to be excluded under MRE 403.

Is there anything else we need to discuss, before we bring in the Jury?

[PROSECUTOR]: No, Your Honor.

THE COURT: And if it is and I am – if I'm wrong, it's 404 character evidence, it's being offered for the proper purpose, which is to prove system in doing an act to corroborate the story of the victim.

All right.  Let's bring in the Jury.

(Tr. III, 830-32.)

The prosecution then recalled Gina Smith to testify in the presence of the jury.  (Tr. III, 832.)  Gina Smith testified that Petitioner placed a pillow over her head during intercourse.  (Tr. III, 833.)  During their marriage, Petitioner placed a pillow over Gina's head about half of the time that they had intercourse.  (Tr. III, 833-34.)  Gina never told anyone about the pillow incidents until she heard Jessica mention it at the preliminary examination.  (Tr. III, 835.)

In rejecting Petitioner's claims on appeal, the Michigan Court of Appeals stated:

Defendant also maintains that the trial court erred by allowing testimony from the victim's mother that defendant would sometimes put a pillow over the mother's face during sex.  The trial court ruled that the mother could testify that defendant would occasionally put a pillow over her face during sex because this information was not character evidence under MRE 404(b) and because the testimony was relevant under MRE 401 in that defendant used a pillow over the victim's face.

The decision to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *People v. Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003).  An abuse of discretion is found only if an unprejudiced person, considering the facts on which the trial court acted, would say that there was no justification or excuse for the ruling made, *People v. Snider*, 239 Mich App 393, 419; 608 NW2d 502 (2000), or the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias, *People v. Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002).

Use of "other acts" as evidence of character is excluded, except as allowed by MRE 404(b), to avoid the danger of conviction based on a defendant's history of misconduct. *People v. Starr*, 457 Mich 490, 495; 577 NW2d 673 (1998). Pursuant to MRE 404(b), evidence of other crimes or wrongs "is not admissible to prove the character of a person in order to show action in conformity therewith." *People v. Knapp*, 244 Mich App 361, 378; 624 NW2d 227 (2001). However, MRE 404(b) is not implicated if evidence of "other acts" is logically relevant and does not involve the intermediate inference of character. *People v. VanderVliet*, 444 Mich 52, 64; 508 NW2d 114 (1993), mod 445 Mich 1205; 520 NW2d 338 (1994). The question is whether the other acts evidence is in any way relevant to a fact in issue other than to show a propensity to commit the crime charged. *Id.*

We find that the trial court did not abuse its discretion in determining that the evidence of defendant's sexual preference for covering his wife's face with a pillow during sex did not implicate MRE 404(b) because this evidence was logically relevant to rebutting defendant's claims that the victim had fabricated or "dreamed-up" her abuse by defendant. Evidence is relevant if it has any tendency to make the existence of a fact which is of consequence to the action more probable or less probable than it would be without the evidence. MRE 401; *People v. Crawford*, 458 Mich 376, 388; 582 NW2d 785 (1998). In this case, the trial court ruled the pillow evidence was relevant because it added to the victim's credibility because she had testified to similar incidents with a pillow during the alleged sexual abuse. And the record indicates that during defendant's cross-examination of the victim, he repeatedly attempted to insinuate that she had "dreamt up" the experiences and falsely accused others of sexual misconduct. Therefore, because this evidence was relevant to a purpose wholly separate from establishing defendant's propensity to commit the charged offense, it cannot be said that the trial court's decision was "grossly violative of fact and logic" constituting an abuse of discretion. *Hine*, supra, 467 Mich at 250.

*People v. Smith*, 2004 WL 1057741, at *3-4 (Mich. Ct. App. May 11, 2004).

Petitioner argues that the Michigan Court of Appeals' determination that the similar sexual acts testimony did not implicate Michigan Rules of Evidence 404(b) is erroneous. First, Petitioner alleges that the trial judge relied on Michigan Rules of Evidence 404(b) rather than Michigan Rules of Evidence 401. Second, Petitioner argues that the trial court abused its discretion by not ruling on the matter when it was introduced during Jessica Gaines' testimony. (Attach. 2 to Pet. at 63-64, docket #1.) As a matter of evidence law, Petitioner's arguments are utterly devoid of

merit -- the trial court and court of appeals correctly concluded that this was not 404(b) evidence. More basically, the extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if a petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard. The admission of the similar sexual acts testimony pursuant to Michigan Rules of Evidence 401 violated no traditional and fundamental

- 39 -

principle of justice.  Even assuming (incorrectly) that this was "prior bad acts" evidence, the United

States Supreme Court has declined to hold that the admission of similar "other bad acts" evidence

is so unfair that its admission violates fundamental concepts of justice.  *See Dowling v. United*

*States*, 493 U.S. 342, 352-53 (1990).  Although the Supreme Court has addressed whether prior acts

testimony is permissible under the Federal Rules of Evidence, *see Huddleston v. United States*, 485

U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  Thus, "[t]here is

no clearly established Supreme Court precedent which holds that a state violates due process by

permitting propensity evidence in the form of other bad acts evidence."  *Bugh*, 329 F.3d at 512.

Accordingly, the state-court's decision to admit the similar sexual acts testimony was neither

contrary to nor an unreasonable application of Supreme Court precedent.

Petitioner further claims that he was deprived of several constitutional rights,

including his right to present a defense, to compulsory process, to due process, and to the equal

protection of the laws when the prosecutor failed to provide notice of the "other acts" evidence to

the defense.  (Attach. 2 to Pet. at 60, 65, docket #1.)  Moreover, Petitioner asserts that the

prosecutor's failure to disclose the other bad acts evidence constitutes prosecutorial misconduct and

a violation of *Brady*, 373 U.S. 83 (1963).  Petitioner's "notice" argument fails under AEDPA, as the

Supreme Court has never held that the federal Constitution requires prior notice of the introduction

of "bad acts" evidence.  Any such requirement is a creature of state evidence law.

For his prosecutorial misconduct claim, Petitioner alleges that the prosecutor engaged

in misconduct by failing to disclose the similar sexual acts evidence and by improperly asking the

victim during direct examination if she had any reason to know that Petitioner placed a pillow over

her mother's head during sex.  (Attach. 2 to Pet. at 65, docket #1.)  Misconduct by a prosecutor can

rise to the level of a due process violation. *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989). However, before habeas corpus relief becomes available, the misconduct must be so egregious as to deny petitioner a fundamentally fair trial. *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir.1993). The habeas court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). In addition, the court may view any misconduct in light of the strength of the competent proofs tending to establish guilt. *See Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*). "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra*, 4 F.3d at 1355 (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Once again, the prosecutor was not required to disclose the similar sexual acts testimony to Petitioner under any federal or state law. The prosecutor's question of the victim also was not error, much less egregious, as the trial court expressly allowed admission of this testimony.

Petitioner finally asserts a violation of *Brady,* 373 U.S. 83, because he was not able to produce witnesses with whom he engaged in sexual relations, to rebut Gina Smith's testimony regarding the pillow incidents. (First Am. Pet. at 7, docket #5.) Petitioner argues that his own failure to call rebuttal witnesses violated the Supreme Court's holding in *Brady*, 373 U.S. 83, and *United States v. Bagley,* 473 U.S. 667, 675 (1985). Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court has held that "[t]here are three components of a true *Brady* violation:

[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 281 (quoting *Bagley*, 473 U.S. at 682). A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Bagley*, 473 U.S. at 682.

*Brady* is completely inapposite. The prosecutor did not suppress any evidence. Instead, Petitioner was fully aware of his own sexual preferences with his wife and was not prevented from calling any witness. Petitioner was on notice of the evidence at the preliminary examination. Further, Petitioner has not demonstrated that the result would have been different given the evidence presented in the case. Petitioner, therefore, cannot establish that the decision of the state court was an unreasonable application of clearly established Supreme Court precedent.

III.    Sufficiency of the Evidence

Petitioner contends that the prosecutor failed to present sufficient evidence to prove the elements of two counts of CSC I against a person under thirteen years of age. A challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be

reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).

The habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-197 (6th Cir. 1988). The elements of the offense are: (1) that the defendant engaged in sexual penetration with another person; and (2) the other person was under thirteen years of age. MICH. COMP. LAWS § 750 .520b(1)(a); *People v. Hammons*, 534 N.W.2d 183, 184 (Mich. Ct. App. 1995). Sexual penetration is statutorily defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body . . . ." MICH. COMP. LAWS § 750.520a(p).

In rejecting Petitioner's claim of insufficient evidence on direct appeal, the Michigan Court of Appeals found that all the elements of CSC I were proven beyond a reasonable doubt with respect to each count:

> In this case, the victim gave explicit testimony describing several different occasions of sexual abuse perpetrated by defendant against her. The victim described separate occasions when defendant penetrated her vagina with his penis or finger. A counselor for Ohio Child Services also testified the victim gave "extremely detailed descriptions" of sexual abuse committed by defendant on her. The victim's mother also testified the victim told her defendant abused her. Defendant never provided any rebuttal evidence to contradict the allegations and testimony provided by the victim or the prosecution's other witnesses. Viewing the evidence in a light most favorable to the prosecution, the record does not support defendant's argument that there was insufficient evidence to support his convictions.

*People v. Smith*, No. 242738, 2004 WL 1057741, at *5 (Mich. Ct. App. May 11, 2004).

The decision of the court of appeals was supported by the trial record. Jessica was born December 28, 1986 (Tr. III, 727); thus, she turned thirteen on December 28, 1999. Jessica and her mother testified that Petitioner lived with them from the time that Jessica was two years old until she was thirteen years old. (Tr. I, 128; Tr. III, 721-22.) The victim's mother testified that they moved to the Betsie River Road house in 1995 when Jessica was in second grade. (Tr. III, 724-25.) The family lived at that address for three years. (Tr. III, 725.) After moving a few times after the Betsie River Road house, they moved into a home on Peninsula Drive on January 17, 1999 when Jessica was twelve years old. (Tr. III, 725-28.) The family lived in that house until February 2000. (Tr. III, 727.)

Jessica testified regarding incidents of sexual abuse that occurred at the Betsie River Road House and the Peninsula Drive house. Jessica testified regarding a specific incident that occurred at the Betsie River Road house in 1996, when she was in the third grade. (Tr. I, 162.) Jessica testified that Petitioner placed her hand on his penis and moved it in a rubbing motion. (Tr. I, 139.) Jessica testified that Petitioner's penis was hard. (Tr. I, 139.) Petitioner then pushed her head onto his penis and told her to think of it as a sucker. (Tr. I, 140.) Jessica testified that it choked her and she managed to pull away after a couple of seconds. (Tr. I, 140.) During the same incident, Jessica testified that Petitioner placed his finger in her vagina and made a rubbing motion with his finger. (Tr. I, 147.) After that, Petitioner went under the covers and licked her vagina. (Tr. I, 141-42, 147.) The victim's mother testified that Petitioner confessed the following day that he made Jessica touch him while he was masturbating, although he denied that any form of penetration had occurred. (Tr. III, 730, 737.) Jessica also testified that Petitioner apologized to her the next day and promised that it would not happen again. (Tr. I, 148, 153, 241, 244.) Jessica testified that she did

not reveal to her mother the full extent of what Petitioner had done to her for fear of breaking up the family.  (Tr. III, 158.)

Jessica's testimony that Petitioner pushed her head onto his penis causing her to choke was sufficient evidence from which the jury could infer that fellatio had occurred, which is considered penetration under the CSC statute.  *See* MICH. COMP. LAWS § 750.520a(p).  Issues of witness credibility are for the jury, *People v. Lemmon*, 576 N.W.2d 129, 134 (Mich. 1998), and the jury may draw reasonable inferences from the evidence, *People v. Reddick*, 468 N.W.2d 278, 280 (Mich. Ct. App. 1991).  Cunnilingus also is included within the statutory definition of penetration, thus, Jessica's testimony that Petitioner licked her vagina was sufficient to establish a second penetration.  In addition, Jessica's testimony that Petitioner placed his fingers in her vagina was sufficient evidence to constitute a third penetration.  Moreover, both Jessica and her mother testified that Jessica was under thirteen years old when she lived at the Betsie River Road house.  Thus, the Betsie River Road incident was sufficient to support at least one count of CSC I against a person under thirteen years of age.

Jessica also testified regarding incidents that occurred at the Peninsula road house when she was twelve years old.  (Tr. I, 181.)  Jessica testified that during at incident that took place during the summer, Petitioner threatened to hit her with a broomstick if she did not follow his directions.  (Tr. I, 176-78.)  He told her to get on the bed, spread her legs and put a  pillow over her face.  (Tr. I, 178.)  If Jessica did not spread her legs far enough, Petitioner would tap her foot with the broomstick.  (Tr. I, 178.)  Petitioner would also hit the bed with the broomstick.  (Tr. I, 177, 184.)  On that occasion, Petitioner exposed his penis, and moved his groin until his penis was completely up her shorts and had entered her vagina.  (Tr. I, 178-79.)  Jessica did not think Petitioner's penis

- 45 -

completely penetrated her vagina but it still hurt.  (Tr. I, 179.)  Jessica testified that this occurred four

or five times a week when they lived in the Peninsula Road home.  (Tr. I, 180.)  The jury could

reasonably infer from Jessica's testimony that Petitioner penetrated her vagina with his penis on at

least on occasion when they lived at the Peninsula Road house.   Complete penetration is

unnecessary.  Penetration, however slight, suffices.  MICH. COMP. LAWS § 750.520a(p).  Jessica's

testimony that she was twelve years old when the incident occurred is supported by her testimony

that the incident occurred in the summer.  Jessica did not turn thirteen until December 28, 1999, and

they moved out of the house two months later while it was still winter.

In light of the evidence presented at trial, the decision of the state court clearly was

a reasonable application of *Jackson*.  Petitioner, therefore, is not entitled to habeas corpus relief on

his sufficiency of the evidence claim.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied on

its merits.

Dated:   February 3, 2009                     /s/  Joseph G. Scoville
                                                          United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections
may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th
Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).